The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Thank you. All right. Good morning. Welcome to this session of the in-bank proceedings. Though we're not in the John Minor Wisdom Court of Appeals building as we would otherwise love to be, we are the panel designated. I'm honored to sit this morning with Judge Gene Davis and Judge Andrew Oldham. So we have first case up, United States v. Norbert, number 20-60106. Mr. Eichner, you're up, sir. Thank you, your honor. Good morning and may it please the court. My name is Andrew Eichner and I represent the United States of America who is the appellant for this interlocutory appeal was that the district court erred in finding that reasonable suspicion did not exist to confront the appellee, Okanlawan Norbert. In this case, the district court applied the Martinez factors from United States v. Martinez 486 F. 3rd 855 861, which is a Fifth Circuit 2005 opinion. But in this case, the district court improperly balanced the facts they applied the rather than looking at the totality of circumstances, they applied a very rigid application of the facts in the law that led to the improper result. Can you help me understand why we're talking about Martinez at all? Because it's not like we're trying to suppress stuff that came from the Terry stop. Right. The question, the suppression question, if I understand it, is about the handgun and the handgun was not in plain view. And if you correct me, if I'm understanding this as well, but the officers had every right to be in the parking lot of the apartment complex. So they were in a place they had permission to be without Terry, without Martinez, without the informant, they could have been just walking down the street. And if they see a handgun on the on the floorboard of the car, they see that in plain view. So I'm not sure I understand why we're even doing the Martinez analysis, Your Honor. So the conclusion that was reached by the approach on to the appellee, Mr. Norbert, was by itself that that was the investigatory stop and that that approach in itself was incorrect under Martinez. And that has framed the reference. So the government agrees that the car was in a public parking lot, where these men had no right to privacy, that the firearm was in plain view, that the officers had a right to go and take the gun from the car, whether that was by consent, as was testified to by one of the officers that appeared, or whether that was by the fact that there is a public safety reason for an officer to obtain a firearm, which is in plain view when they have an active investigation going with a number of people that they need to control. The district court's finding was that based on the which brought them to the scene in the first place and eventually led to their interaction with Mr. Norbert, that reasonable suspicion in itself did not exist to speak with the defendant at all. Would it be different if the police found out from Norbert that the gun was his? Did they not? They did, Your Honor. That's correct. And that was that was part of the stop. And they also got an acknowledgment by Norbert that the automobile belonged to him. That is also correct, Your Honor. There was also some other individuals before Mr. Norbert even approached law enforcement at the scene. There were a number of individuals that law enforcement had already interacted with. And as Mr. Norbert was approaching one of the other individuals before police even engaged with Mr. Norbert, one of the other individuals identified that the person walking towards them was N.O., who was O.K. Norbert, and that the vehicle, the black infinity there, did belong to him. So they actually found that out before Mr. Norbert even came. I'm sorry if I interrupted. No, no, I didn't mean that. I want to make sure you had gotten the sentence out. Thank you. Yes, sir. OK, so did the police officers need reasonable suspicion under Terry to ask whose handgun is this? No, sir. No. And they don't need reasonable suspicion under Terry to say to look inside the window of a car and see a handgun on the ground. No, I'm sorry, on the clipboard. But when they when they make a Terry stop and they discover information, whether they could have discovered it some other way or not, then that is part of the part of the Terry stop that has to be justified, is it not? Once they have a stop, it is information that has to be justified by reasonable suspicion. Your Honor, that is correct. So the information that is obtained from that individual once the by. Can you help me understand the sort of sequence of events? Because when we read the factual recitations in the briefs and even in the records, it's not completely obvious sort of minute to minute how this unfolded. My understanding is that Mr. Norbert was not when the police officers approached the group of individuals, Mr. Norbert is not there. That's why when he when someone says whose infinity is this, one of the individuals who is engaging in a voluntary conversation with the police officers makes a sort of looks over his head gesture. And then Mr. Norbert comes from some other part of the parking lot and says, oh, man, I was going to run. But I saw you had officers on the other side over there. So I just came back. Yes. So at what point? I think it's everyone agrees that there's some Terry stop at some point because obviously people were patted down and that's when we find the marijuana baggies. But what is the point at which the Terry stop happens? Yes, your honor. And I agree. So at the point, even as Mr. Norbert returns to the police, the stop has not occurred at that time. The time where the stop would have occurred would have been when Mr. Norbert was patted down. Now, part of the and I agree it's unclear in the record that it's not entirely clear whether that pat down occurred at the same time as everyone else was patted down, whether they found the marijuana on the other individual before Mr. Norbert was patted down. But certainly by the time that Mr. Norbert is walking back to law enforcement saying, hey, I was trying to run away. I saw more of you on the other side. So I decided I'd just come on back. At that point, he's not stopped. He is, in fact, approaching law enforcement. And at what point do we find the handgun? Is the handgun found before or after Mr. Norbert is patted down after after so that some he's patted down and at some point someone looks into the car and sees the handgun? Yes, your honor. I thought all of them were patted down at the same time. That's the way the record seemed to me. Is that not right? Well, your honor, it's not entirely clear. And so what happened was there were when the police arrived at the parking lot, there were a number of individuals that were there. They were standing around. Mr. Norbert at that time had taken off. He had tried to run away. Those individuals, it appears that they were being spoken to by law enforcement. And then at some point when they're asking, hey, whose black infinity is this? And where's I know that's when the person makes kind of the head gesture with the eyes that investigator Levine described that identified. Which one of you is in home? It could have been that your honor. I believe that the investigation was. And if you'll excuse me just for one second as I refer to my notes. I believe that was correct, your honor. And so at that point, though, I know is not among the crowd. So I know is then walking back towards the law enforcement at that time. And it's then indicated that this individual approaching is I know who is the person that the caller earlier had said is dealing drugs out of the parking lot out of that black. OK, can you point to anything in the record that would show that they weren't all padded down at the same time? I know your honor, there is not clear in the record exactly when the pads out. And it's your burden to justify the search, is it not? I'm sorry, your honor. It's the burden. It's your burden to justify the stock. Yes, your honor. It is. But the government's position is that a reasonable suspicion existed at the time where by the time that Mr. Norbert came back to law, enough had been corroborated from the initial call that had been made by the manager at the apartment complex. That enough was observed by law enforcement upon the scene that they were able to determine that there was, in fact, a black infinity matching that phone call. There was a group of men. There was a individual who approached them with a matching complexion that had been described. By the caller who identified themselves as being with the apartment management. And by that and the individual, not only that, but the individual that had been trying to run away was that very individual, the one that went by, you know, that matched the complexion. I claimed ownership of the vehicle and that other people on the scene actually identified that that vehicle belonged to that individual. By that point, reasonable suspicion existed for the investigatory stop in the path. RG, talk to me about the reliability of the informant. I mean, all the the officers, the officer who took the call said that the caller identified herself as someone from management and indicated she indicated she had seen certain activity. Yes. And then is there anything else in the record that indicates that she had any personal knowledge of any drug activity? Yes, your honor. So the as you mentioned, the individual identified themselves as being with management at the apartment complex that's at record site 156. She specifically identified the apartment complex where the drug dealing was occurring and specifically said it was occurring in the parking lot there. That was at record site 157. She described the drug dealing as a personal safety issue for tenants who had a fear of coming and going. That's also at 157. She said that this was a problem that had been occurring for some time. That was at record site 175. She also said that she had actually spoken with other law enforcement agencies as well and not had success in having anyone other than the sheriff's office to come out there, which again is a personal knowledge as opposed to information should be seen from the tenants. Is that the only passage in the record that would support that she saw certain activities? So she said, yes. So at 177, she said that she personally observed the drug dealing. And at 181, she said that she had received complaints from She had also heard about it from other people and was then contacting law enforcement. Where did she say she had personally observed? I was at record site 177. Yes, sir. All I see in the record is she said she had seen all certain activity. Is there anything any more specific? No, your honor. That's the that's the passage I'm referring to, that she had seen certain activity that she complained about to others, which would again suggest that that is the drug dealing activity. Police did not get her name. That is correct. Or her phone number. Yes, your honor. And the call wasn't recorded. Yes, your honor. And there's nothing in the record that indicates the police had called her ID. That is correct, your honor. Mr. Agner, what was she wrong about? Your honor, she wasn't wrong about anything. I mean, the way I look at it, she I mean, she had she even had the license plate number, six digit alphanumeric, and she transposed to two and a five, right? It's an alphanumeric license plate number that has twos and fives in it. She had one extra two, she should add an extra five. Yes, your honor. Every single other detail that she gave to the police turned out to be corroborated. Yes, your honor. And in fact, it's not clear whether that was a transcription error by law enforcement, as the testimony in the record was that she gave a matching law license plate number. All that was innocent activity, though. None of that confirmed any drug activity, did it? Well, your honor. So when when the police arrived, the drug activity was not immediately confirmed. Can you answer my question directly? Did any of that information you just overconfirm any drug activity? Well, aside from that, she said, your honor, that she saw when they arrived, what they from what they saw on the scene? No. But the the fact that so many of the other facts can be corroborated, even if police don't see criminal activity immediately upon arrival, the corroboration of other detail do lend credibility to the caller. And in fact, I think the court's indulging. In Adams versus Williams, which was cited by by the Supreme Court again in Navarrete versus California, criminal behavior does not need to be personally observed by police for reasonable suspicion. And in Alabama versus white, they talk about when an informant is shown to be right about some things. He or she is probably right about other things, including the object of the tip being engaged in criminal activity. Of course, Navarrete was a 911 call case. It was, your honor. And the police and the courts have considered those differently than just ordinary tips, haven't they? Yes, your honor. And but the fact of the matter is that we're still looking at the totality of the circumstances to determine whether reasonable suspicion existed. And in this case, reasonable suspicion did exist. All right, Mr. Agnew. Other questions from the panel? Judge Oldham? Judge Davis? All right. OK. Thank you, Mr. Agnew. You've reserved your rebuttal time. Thank you. We'll hear from Ms. Bromley. Thank you, your honor. Good morning. And may it please the court. My name is Abby Bromley, and I represent the athlete, Mr. Okolaw and Norbert. And on behalf of my client, I ask this court to affirm the district court's ruling when it granted Mr. Norbert's motion to suppress. Now, the district court conducted a suppression hearing, including testimony of two officers. The district court found that the officers lacked the reasonable suspicion required under the first prong of Terry versus Ohio to conduct an investigatory stop with Mr. Norbert. The court found that Mr. Norbert's detention was an unlawful search and seizure under the Fourth Amendment. And the court employed a four-part test in accordance with United States. Ms. Bromley? Yes, your honor. What is the best case for the proposition that finding a gun in plain view requires reasonable suspicion? Well, your honor, in this situation, we have a case where but for the Terry stop, the gun would not have been found to begin with. So what would be the case? What is the authority that you would rely on to say that we therefore need to go back to the Martinez factors as applied to the apartment manager to justify finding a handgun in plain view? Your honor, in our parking lot, that is private property, and you have the officers approaching based on information that they received. And which of the individuals, which of the individuals in the parking lot lived in the apartment complex? Your honor, that was something that was not clear based on testimony at the hearing. I thought it was undisputed that none of them lived there. Your honor, there was one officer that testified that there was a gentleman there who was staying in an apartment that was because he was somehow associated with someone who worked in maintenance, I believe. Do you remember the participle that that man used to describe his behavior? I believe they said he was squatting in the apartment. So yes. As far as what was contained in the record and from the testimony at the hearing, we don't know if any of them were in fact living in the apartment. Okay. So what would be the best case? I'm just looking for a case, any case from any jurisdiction, any court that would say that we need to have reasonable suspicion and we need to apply the Martinez factors as applied to the informant to justify finding a handgun in plain view, where apparently Mr. Norbert did not live there. His car, it's not like he was parked in his parking spot at his home. It was, they were in a parking lot congregated together. The officers looked in the window and found the handgun. Both of them said that they disagreed slightly on where it was on the ground in the car. Was it on the floorboard? Was it between the seats? But they saw it in plain view. And I looked and read your cases and I can't find one. And I'm hoping maybe today you have one. Your Honor, that was an issue that the district court determined that we had to look at reasonable suspicion. And they found that, but for being able to approach Mr. Norbert, speak with Mr. Norbert and Mr. Norbert saying, yeah, that car is mine. And I believe even one officer then testified that he received consent to search the car. So, but for needing to reach the burden of the first prong of Terry, they did not have reasonable suspicion to even speak with Mr. Norbert for Mr. Norbert to give the information regarding getting into the car. Did police officers need reasonable suspicion to ask you a question? Well, in this case, the court actually did look at that and they determined that this was a situation where it was considered a stop, where it did fall under Terry and they wouldn't need reasonable suspicion. So the district court did... I'm sorry, Your Honor. Oh no, please finish. I didn't mean to interrupt. The district court did in fact make that analysis and we agree that they made that analysis correctly. If I'm just walking down the street and I have a handgun and I drop it and a police officer asks me that question without having reasonable suspicion under Terry. Well, Your Honor, I believe that Terry would apply in that case and it would be especially in situations such as Mr. Norbert's where they approach a group of individuals and immediately started patting them down. So I think that in this case in particular is much different than the case you're talking about where they would need reasonable suspicion to go forward at that point. They would not, I'm sorry. They wouldn't need reasonable suspicion. Yes, Your Honor. So what exactly is, from the public defender's office's perspective, what was the apartment manager wrong about? Your Honor, it doesn't necessarily have to do with what the apartment manager was wrong about, but it's what in fact did the apartment manager supply? What information? And I believe that Judge Davis actually questions Mr. Eitner about this and this is where this case aligns squarely, as stated by the district court to the Supreme Court of case of Florida versus JL, which the information provided it by the anonymous caller in the tip was that this is readily observable information. It is nothing illegal. Can we, since you brought up JL, let's just take a quote from it. This is from page 271. All the police had to go on was the bare report of an unknown, unaccountable informant who neither explained how he knew about the crime nor supplied any basis for believing he had inside information. So in this case, you have an apartment manager who admittedly doesn't give her name. And so, but we know that it's an apartment manager, right? That's what the police do. That's what the police understand. Apartment manager personally witnessed this and then provides all manner of detail, including identifying information about the individuals, the type and make and model of the car. And as far as I can tell, the only thing she messed up, as Mr. Wagner points out, maybe it wasn't even her, maybe the police officers transposed the two and the five. She's off by one digit between a six digit alphanumeric license plate number that it contains both two and fives. And she used an extra two instead of an extra five. Yes, your honor. And what we would say that she actually provided to the officers was a conclusion. And she stated that was illicit narcotics dealing. And she didn't supply facts that actually supports how she fought to that. She provided information describing Mr. Norbert or describing a suspect, describing a location and describing a vehicle. But she didn't actually say what she observed to get to the conclusion that drug dealing was in fact going on. So that would be the best case that would say that the informant needs to identify something more than I'm sitting here witnessing this at this exact moment with my eyeballs. I see this going on. Here are the people doing it. Here's the kind of car. Here's the license plate. Well, none of that's in jail. No, it's not, your honor. And I think that in this situation, though, you brought up something very important. We don't know if it was going on when she made the call. We have nothing to indicate that it was something that was contemporaneously going on or that it was a startling event or anything of that nature. So we also have a this is exactly what I'm observing. But she never said when she actually observed it, for how long has she been observing it, for how over how many days, what time of day did this in fact happen? And most importantly, she doesn't even talk about the type of drugs or the manner in which they're being sold or other people assisting the suspect. She gives a description of one person, but are other people assisting? Where on the property did this in fact happen? So she her her information is limited and basically lack. She also let me get this. I'm I'm sort of confused by your answer. So help me understand it. The police get an informant tip. Now, we all agree. I would assume that the police have the right to investigate the tip, right? Absolutely. You can disagree about what they have to do to investigate, but they can investigate it. So if if the woman says, I'm the manager at this apartment complex and this is happening in my lot, whether she says it's happening in this instant or it happened 10 minutes ago, if the police go to exactly where she said it was happening and they see the exact people she described with the exact car, with the almost exact license plate, I don't understand what more they're supposed to do before they can approach and figure out if everything else she said is also true. But what else are they supposed to do? Are they supposed to call the apartment complex maybe and be like, can I talk to the manager? We want to make sure that this is not a prank. I'm not sure what else they're supposed to do. Yes, your honor. We assert that that is one thing they can do. There were a number of things they could do. So what would be the best case that would say you have the Fourth Amendment obligates you to call the apartment complex and identify the caller before you go to the go to the place she said that they would be. And voila, there they are. Well, your honor, I don't believe we have a case that is right on point regarding calling an apartment complex. But we would state that we have a situation where absent any corroboration of the illegal activity itself, then the government has no reasonable suspicion that criminal activity is afoot. So you have a situation where the officers could have set up surveillance. If they set up surveillance, they could have possibly observed something that would have corroborated information she gave. But also we have a situation where she didn't provide any information that could really be corroborated other than description. She didn't provide things such as predictions, such as if this is the route in which this individual is going to take her. This is the way in which this drug dealing occurs to where officers could go out, set up surveillance and actually determine and corroborate that the information she gave was correct. I guess what I'm getting at is I'm just trying to figure out. So so far, we've gone through three legal propositions and we haven't found any precedent that at least the public defender's office is not aware of any. And so obviously we see cases of first impressions. So maybe your position is this is this is completely a case of first impression. It's a case of first impression about the question of plain view. It's a question of first impression about the Terry stop. And it's a question of first impression about what else you have to do to identify, corroborate the informant or the tipster. I guess what I'm trying to get at is do you have anything that can guide the court in its application of law that says where a woman where a woman calls and says, here's a bunch of information? Let's just say here's five facts. If the police officers can corroborate four of them, why are they not allowed to approach the individuals to try to corroborate the fifth one? That's what I'm hung up on. I just don't see any of these cases saying that. Because they are not they haven't corroborated anything that deals with criminal activity. What's the case that says that? What's the case that says you can't actually do it until you see the drugs change hands? You can't approach them until you Your Honor, I think that this case is very similar to the fifth circuit case of the United States versus Roque. And I'm not sure I'm pronouncing that correctly, Roque or Rock. It's United States versus R-O-C-H-5-F-3-8-9-4. And in that case, we had an informant who what has, in fact, been used in the past and the agent in that case actually knew that informant, which is much different than the case we have here. Because in the case we have here, we do see the position that Judge Davis questioned Mr. Eitner on. This informant didn't even use the 911 service, did not provide her name, her address, her telephone number. So we have much different. Now, she said she was with apartment management, but that wasn't verified. Also, she chose to call the Hines County Sheriff's Department. So she did not actually even call the agency since this was inside the city limits of Jackson. She didn't even call the agency that would normally be a specific one to call. But in the case of Roque, we have where a gentleman's name was given, and it was told what kind of crime that he was going to be doing. It described a vehicle. It described a motel. Surveillance was actually set up where they observed a man meeting that description. They followed him in that car. They stopped him. And this court said at page 898 that the absence of significant details of a prediction of future behavior prevents us from holding that such information provided a sufficient basis for a reasonable suspicion finding. Here's the thing I get hung up on is suppose this panel were to hold that the officers in this case weren't allowed to approach the individuals and conduct a Terry stop until they saw drugs change hands. We would agree that watching the drugs change hands would not be reasonable suspicion. That would be probable cause. You wouldn't need to do a Terry stop. You could just straight up arrest everybody. So they need to have something less than seeing the drug change hands. And I'm confused then by what your something less than is. Something less than, Your Honor, and this would just be an example of something off the top of my head, would be something that indicates drug activity is going on. For example, if the tipster had provided information such as the, and this is me totally just giving an example, but such as the suspect comes out of apartment number A at such and such time, sits there for five minutes, two cars approach. He goes to the window of the car. Another individual goes to the other window of the car. Transactions occur. Something that could be observed that would indicate that criminal activity is going on, but we don't have that in this case. And we, it's a situation where because we don't have that as the district court ruled correctly, absent that absent any corroboration, we don't have reasonable suspicion in this case. I'll give you a quote from JL, Florida v. JL, where it said, a tip may be reliable and helpful to identify a person the tipster wishes to accuse, but this does not show the tipster has knowledge of the person's criminal act. Reasonable suspicion requires that a tip be reliable in its assertion of illegality, not just to identify a person. Yes, sir. And I appreciate Judge Davis, you making that quote for me. That, that is exactly what we believe the district court was saying in this case. The district court gave a descriptive analysis of three specific Supreme court cases and actually found that this case squarely aligned with Florida v. JL, which is what our position is here today, defending the district court's ruling. We believe that in the case of Florida v. JL, the facts should squarely align with the case that we have at hand today. And that the only thing that was given by the informant was a description, a readily observable description that basically anyone could go out there and see and then accuse someone of doing a crime or committing a crime without anything else that actually supports that. There are a number of things that support Mr. Norbert regarding the totality of the circumstances, such as the tip was made anonymously. Now, while this person did say that she worked in management at the apartment complex, we have no way of knowing if that is in fact true. No 9-1-1 service was utilized. And then we also have in Navarrete v. California, where the Supreme court says that the 9-1-1 service, it helps with credibility. It issues some kind of reliability on credibility. We also have that the tipster relied upon secondhand information. We have where she actually said that the tenants were scared to come and go. So it's a little confusing in the record of what actually she observed as opposed to what actually she heard from other people. We also have a situation where the tipster made no indication the crime was happening at the time of the call. This didn't seem to be a contemporaneous event. It didn't seem to be a startling event. No future activities of the suspect were provided that could in fact be corroborated by the officers. No details regarding how long the drugs have been sold at this location. Plus, I think it would be a miss for me not to point out the physical description given of the suspect of So you have an approximate population in Jackson, Mississippi of 175,000 people. And you have 82% of those are African-Americans. I think we could say approximately half of those would be male African-Americans. That doesn't really limit down on the population. And it doesn't really help with support the description that she gave. We also have that no surveillance was conducted by law enforcement. No signs of drug dealing were seen by the officers. And no attempt was made to contact the apartment management. So in closing, your honors, the district court ruled correctly in this case. The district court not only heard the live testimony of the officers, observed their testimony, but the court, as you can see in the record, actually questioned the officers probably just as much as Mr. Eichner and I did. And furthermore, the court provided a very detailed analysis of the law in a written ruling that was proper in light of the totality of the circumstances. The totality of the circumstances, as well as the four-part test determining the reliability of the tip, showed that the district court ruled correctly bringing Mr. Norbert's motion to suppress. The bottom line, your honors, is that absent corroboration of illegal activity, the deputies lacked reasonable suspicion to of Mr. Norbert. And we ask that this court confirm the district court's rule. Thank you. All right. Thank you, ma'am. All right. We're back to you for rebuttal, Ms. Eichner. Thank you, your honor. So just to revisit something that Judge Oldham had mentioned, finding a handgun in a vehicle in plain view in a parking lot where none of those individuals had been. Getting to that handgun, again, I think that that is entirely independent of the reasonable suspicion Martinez factors argued. Police had the right to go look in that vehicle and find that gun. In addition to the fact that running the tag on that vehicle would have identified to them immediately who the owner of that vehicle was. I would like to revisit some of the things that the discussion about no predictions. One of the things that comes up again and again in some of the case law surrounding reasonable suspicion is whether predictions of future behavior come come to bear fruit. In this case, this person was describing a pattern of behavior, a repeated pattern of behavior that she had personally observed and had received reports on from other uh they are still out there doing this. The pattern is repeating itself and when the police go out there it's immediately apparent that this pattern, this pattern of drug dealing activity occurring in this parking lot is in fact still occurring. How did they know there was drug activity going on until they found drugs on one of the men during the pat down? I'm sorry, your honor? How did the police know that the men were gathered in the parking lot to uh do drugs until they found the small amount of marijuana in one of the men that was in the group? Well, they didn't they didn't know, your honor, but they had reasonable suspicion to continue their investigation. Based on the informant? Based on the informant and what they found when, I'm sorry, the caller uh and and what found once they arrived on the scene. Okay. Corroborated what the caller said in virtually every way. The uh the fact that uh as Ms. Brumley made an argument that there was no support for illegal activity there uh even prior to finding the drugs on the individual uh that was not Mr. who Mr. Norbert cannot assert any sort of right on behalf of that individual. But uh prior to that we had Mr. Norbert returning to the scene saying, hey I saw that there was law enforcement coming and I was going to run away. So he at the very beginning is telling them I am running away from law enforcement. I'm getting out of this situation which again heightens reasonable suspicion and corroborates the fact that there was in fact activity that was going on in that area. Can you point the record to tell me when that statement was made whether it was before or during the pat down? That was made that was made before the pat down and that was made uh it was said in record site uh 186 187 in that part of the record uh that uh Norbert is then approaching the police and he is saying oh I was going to run away but there were more more y'all on the other side so I did. I came back. And it's uh in approximately around that time that he confirms that he goes by N.O. That the Black Infinity is his I'm sorry that that admission is at 185. Um I would also like to address the argument that uh the description of Mr. Norbert fits a bunch of men in Jackson. Um again in this in this case this is a black a black male dark-skinned who goes by N.O. with gold teeth who drives a Black Infinity with a particular tag number and those are all observable by law enforcement. As as the individual is approaching we have multiple people saying we have another individual saying he's N.O. We have him admitting he's N.O. him admitting that's his car another individual saying that's his car given again the reasonable suspicion certainly existed for the stop uh and and and the police would have been able to get to that that firearm in that car even independent of the stop just based on its location. All right thank you Ms. Teichner. Thank you Ms. Brumley and Ms. Teichner for your uh briefing on the case and responses to the court's question as well as your argument. The case will be submitted and we'll get it decided as soon as we can. You are you're excused with the thanks of the court. Thank you your honor. Thank you your honors.